# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MISSOURI
# EASTERN DIVISION

| | | |
|---|---|---|
| NEW LIFE EVANGELISTIC CENTER, INC.,<br>A Missouri non-profit corporation, | ) ) ) | |
| Plaintiff, | ) ) | Civ. No.<br>Jury Trial Demanded |
| v. | ) ) ) | |
| CITY OF ST. LOUIS, MISSOURI,<br>A Missouri municipal corporation | ) ) ) | |
| Defendant. | ) ) ) ) | |

## VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiff, New Life Evangelistic Center, Inc. ("New Life" or the "Church"), a Missouri non-profit corporation, by and through its attorneys *Dalton & Tomich, plc* and *Brown & James, P.C.*, states the following as its Complaint against Defendant, the City of St. Louis, Missouri (the "City"), under the Religious Land Use and Institutionalized Persons Act, 42 U.S.C. 2000cc *et seq.*, the First and Fourteenth Amendments to the United States Constitution, the Missouri Religious Freedom Restoration Act, Mo. Rev. Stat. Sec. 1.302, and the Missouri Constitution.

### Introduction

1.     This is an action for declaratory relief, injunctive relief, and damages arising from the City's discriminatory and unequal treatment of the faith-based ministry Plaintiff operates within the City. New Life alleges that the City has applied its City Revised Code to New Life in a manner that violates the Religious Land Use and the Institutionalized Persons Act of 2000, 42 USC § 2000cc ("RLUIPA" or the "Act"), the

First and Fourteenth Amendments to the United States Constitution, the Missouri Religious Freedom Restoration Act, Mo. Rev. Stat. Sec. 1.302 ("RFRA"), and the Missouri Constitution. The relief sought by the Plaintiff herein arises out of, and involves, a case of actual controversy involving adverse, immediate and restrictive effect on guarded constitutional precepts, valuable property rights, private and protected property interests, protected religious interests, protected rights of religious observances, rights of free assembly and other protected rights, including constitutional rights resulting in irreparable harm to the Plaintiff of an immediate nature, and for which there is no available adequate remedy at law. Plaintiff is seeking, in part, a declaratory judgment pursuant to Fed. R. Civ. P. 57 and 28 U.S.C. 2201, and includes a request for a speedy decision and an advance on this Court's calendar under Rule 57 and 28 U.S.C. 2201.

## Parties

2.      Plaintiff New Life Evangelistic Center, located at 1411 Locust Street, St. Louis, Missouri 63103 ("New Life" or the "Church") is a non-profit religious corporation organized under the laws of the State of Missouri.

3.      Defendant City of St. Louis (the "City") is a municipal corporation and political subdivision of the State of Missouri.

## Jurisdiction and Venue

4.      This Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1331 as a Court of original jurisdiction of all civil actions arising under the Constitution and the laws of the United States and under 28 U.S.C. §1343(a)(3), in that it is brought to redress deprivations under color of state law, of rights, privileges and

immunities secured by the United States Constitution; specifically the Religious Land Use and Institutionalized Persons Act, 42 U.S.C. §2000cc *et seq*., in that it seeks to recover damages and equitable relief under acts of Congress, under 28 U.S.C. §2201(a) to secure declaratory injunctive relief under 28 U.S.C. §2202, and under 42 USC § 1988(b) to secure reasonable attorney fees and costs as part of the case.

5.     The venue in this action is proper within the Eastern District of Missouri pursuant to 28 USC § 1391(b) and E.D. Mo. L.R. 2.07(A)(1), in that (i) Defendant is situated within this judicial district, (ii) Plaintiff is located within this judicial district, and (iii) all of the claims asserted by Plaintiff arose in this judicial district.

### Factual Allegations

*New Life Evangelistic Center*

6.     Plaintiff New Life Evangelistic Center is an interdenominational Christian church and Missouri non-profit religious corporation that is tax exempt under IRS Code Section 501(c)(3). ***Exhibit 1***, Articles of Incorporation; ***Exhibit 2***, Tax Exempt Status.

7.     In 1972, Reverend Larry Rice formed the Church for the purpose of carrying out the mandates of scripture, including the Biblical directive contained in Proverbs 31:8-9, which instructs Christian to "[s]peak up for those who cannot speak for themselves, for the rights of all who are destitute. Speak up and judge fairly; defend the rights of the poor and needy."

8.     A vital aspect of New Life's religious mission is to actively serve the less fortunate, since the Bible states: "What good is it, my brothers and sisters, if someone claims to have faith but has no deeds? Can such faith save them? Suppose a brother or a sister is without clothes and daily food. If one of you says to them, "Go in peace; keep

warm and well fed," but does nothing about their physical needs, what good is it? In the same way, faith by itself, if it is not accompanied by action, is dead. But someone will say, 'You have faith; I have deeds. Show me your faith without deeds, and I will show you my faith by my deeds." James 2:14-18 (*Common English Bible*).

9.      New Life is also guided by the principles declared by God in Isaiah 58:6-7: "Is not this the kind of fasting I have chosen: to loose the chains of injustice and untie the cords of the yoke, to set the oppressed free and break every yoke? Is it not to share your food with the hungry and to provide the poor wanderer with shelter—when you see the naked, to clothe them, and not to turn away from your own flesh and blood?"

10.      The Church and its members believe the Bible teaches that salvation is a result of the grace of God extended to sinful human beings through Jesus Christ, and those who have received God's grace are called to shelter the homeless, feed the hungry, and care for the sick and imprisoned. Matthew 25:31-46.

11.      Based on these Biblical mandates, New Life and its members firmly believe that serving the poor and less fortunate members of society, including sheltering the homeless, is an essential and indispensible function of the Church's religious worship and beliefs.

12.      As such, New Life and its members work daily to provide Christian hospitality to the less fortunate and homeless in St. Louis and beyond. *Exhibit 3*, About Us. New Life provides food, shelter, and clothing, education, job training programs, and physical, mental and spiritual health care to members of the homeless community. *Id*.

***The Property***

4

13.     After its founding in 1972, New Life originally operated out of a fifty-foot trailer, and after experiencing rapid growth operated its headquarters out of 2107 Park Avenue in the City from 1972 until 1976.

14.     Because of the Church's quick development, in 1975 New Life purchased the five-story former YWCA building located at 1411 Locust Street in the City (the "Property") to serve as New Life's new spiritual home.

15.     New Life officially received title to the Property in November 1975.

16.     In early 1976, City officials instructed New Life to submit an application for a hotel permit to the City in order to be able to use a portion of the Property as an emergency overnight shelter for homeless individuals.

17.     Pursuant to the City's instructions, New Life submitted a hotel permit application in early 1976.

18.     On March 16, 1976, the City granted New Life's request and issued it a hotel permit, Permit No. 84777 (the "Permit"), which allows New Life to provide 32 beds at the Property. *Exhibit 4*, Permit No. 84777.

19.     New Life continued to provide religious services and overnight shelter for the homeless at the Property, and has continuously provided religious services and emergency shelter for the homeless at the Property since the Property's dedication in early 1976.

*New Life's Homeless Ministry at the Property*

20.     An integral part of New Life's Christian ministry is its emergency homeless shelter, which operates 365 days per year at the Property.

21.     New Life's founder, Reverend Rice, views providing shelter and other related relief services to the homeless and those in need as a concrete form of religious worship.

22.     On average, New Life welcomes between 225 and 250 individuals each night. However, on cold nights, this number can reach 300 guests.

23.     Given the frequent lack of available shelter space within the St. Louis City Continuum of Care, oftentimes New Life is the only emergency shelter with available space. For this reason, and because New Life does not require a referral from the Housing Resource Center, New Life often functions as an overflow shelter for homeless individuals who were unable to obtain such a referral.

24.     New Life offers shelter to homeless individuals for different timeframes:

    a.  Basic Shelter. Any person seeking emergency shelter is able to join New Life's 14-day program. Those in need at the end of their 14-day stay can seek to stay for an additional 14 days, and thus can stay at New Life for a total of 28 days. At the end of 14 or 28 days, the individual has the option to join one of New Life's programs and in turn stay longer at New Life. Guests participating in the 14-day program are not required to volunteer at New Life.

    b.  Transitional Housing. New Life also offers 30-day programs for both men and women. All participants in the 30-day programs must submit to a criminal background check. To participate in the 30-day program, individuals must participate in the Church's worship services and must volunteer at New Life. Women must volunteer for 3 hours per day, 6 days a week in exchange for free room and board. Men must volunteer up to 6 hours on weekdays and 8 hours on weekends if they are unemployed, and 3 hours per day if they are employed, since New Life believes in giving its guests a hand up rather than a hand out.

    c.  90-day Program. New Life also offers a 90-day program for women who finish the 30-day program and for veterans. To participate in the women's program, the women must volunteer for 25 hours per week in exchange for room and board. The women are evaluated every 30 days to ensure they are maintaining sobriety and dependably volunteering at New Life. To participate in the veterans program, the guest must show a valid DD-

214 or VA medical card. Participants in the 90-day programs are also required to participate in the Church's worship services.

d. <u>Two-year Leadership Training Program</u>. New Life also offers a two-year leadership program. Participants in the leadership program serve full time without pay, but receive free room and board, prescription assistance, transportation, and a variety of additional assistance. Participants in the leadership program obtain on-the-job training in a variety of fields order to help them establish a work history for future jobs. Participants are also required to participate in the Church's worship services. In those cases where participants receive regular monthly disability income, they donate up to forty percent (40%) of their income in exchange for the long-term room and board. Participants who do not receive disability income do not have any income, since participants in the two-year program do not hold outside jobs. Since these participants have no income, they necessarily are not requested to donate any income to New Life.

*Exhibit 5*, Men's Shelter & Training Program; *Exhibit 6*, Women & Children's Shelter & Training Program.

25.     New Life believes that by offering such on-the-job training to its guests, it is actively working to further the Biblical mandates to preach the Gospel and serve the less fortunate.

26.     The Church provides a variety of religious services, including daily Bible studies for men and women, weekly observance of communion, intercessory prayer, and weekly worship services for all New Life guests that are also open to the public. New Life also provides regular prayer counseling that is available in person and over the phone, along with evangelistic outreach through print, internet, television, and radio.

27.     New Life also offers a variety of additional services at the Property, including ministerial services, utility assistance, a free clothing store, prescription assistance, funeral expenses, aid for stranded travelers, life skills training, and public transit assistance.

28.     New Life intentionally does not have any social workers, psychologists, or doctors on its staff. Instead of using its limited resources and funds to provide duplicate services, New Life employees serve as case managers and actively work to assess the guests' needs and recommend and refer the guests to certain social services organizations that are located in the area based on the guests' needs.

29.     New Life also allows outside social workers to use the Property during the day, when New Life is otherwise closed, in order to meet with clients who are guests at New Life.  In the past, New Life has also enlisted the help of volunteer doctors and may do so in the future, should the need arise.

30.     The Property contains five floors and a basement. The basement contains shower and laundry facilities for guests. The first floor houses the main lobby, the front desk and phone operator, a worship studio, administrative and business offices, Pastor's office, copy room, a small television studio for KNLC Channel 24, a free clothing store, free storage for New Life guests, and space for life skills classes.

31.     The television station, which is licensed by the Federal Communications Commission, provides additional training opportunities for those guests participating in New Life's two-year training program.

32.     The Property's second floor contains New Life's Grade A kitchen facility, renewable energy office, Pastor's office, a prayer room, a library, and development offices where New Life representatives do fundraising and communications activities.

33.     Women and children guests are housed on the Property's third floor.

34.     Male participants in the two-year Leadership Training Program are housed on the fourth floor.

35.     Male guests participating in the 14-day Basic Shelter Program and the 30-day Transitional Housing Program are housed on the fifth floor.

36.     New Life is not openly accessible twenty-four hours a day. Rather, it closes during the day to allow guests to seek services through the many other organizations that operate in the vicinity.

37.     New Life opens its doors for women to check in from 3:00 p.m. to 4:30 p.m. Men may begin to check in at 5:00 p.m. until 7:30 p.m. New Life then reopens for women at 8:00 p.m. and men at 9:00 p.m.

38.     New Life's guests that are participating in the 14-day Basic Shelter program must leave in the mornings by 6:45 a.m. The purpose of this policy is to encourage the guests to make use of their talents and to not become dependent on New Life.

39.     However, the Property remains open during the day for specific occasions. For example, the Free Clothes Store is open from 9:00 a.m. until 12:00 p.m. during the week and upon appointment on the weekends. New Life also serves free sandwiches daily at 11:00 a.m., and offers life skills classes on Tuesdays and Thursdays.

*Security at New Life*

40.     New Life rules and regulations strictly forbid any alcohol, drugs, and weapons from entering the Property. *Exhibit 7*, Overnight Guest Agreement.

41.     In order to enforce its rules and regulations, New Life employs a security company called Sentry Security. The Sentry Security guard patrols from 11:00 p.m. to 7:00 a.m.

42.     Certain participants in the two-year Leadership Training Program also serve as security guards at the Property during the day and at night. All of these individuals who serve as security guards go through a criminal background check and receive on-the-job security training.

43.     Each guest checking in to New Life must provide identification and undergo a pat down process by New Life's security guards.

44.     If someone checking in to New Life is visibly intoxicated, that person will not be permitted to stay at New Life. The only exception to this rule is if the temperature is below 32 degrees, at which point the person is allowed to enter but must sleep in the lobby area on the first floor of the Property.

45.     At the suggestion of neighbors, New Life also added various security cameras and lighting at the Property. Currently, there are also approximately twenty seven (27) security cameras installed in and around the Property, which are monitored by security officials.

46.     New Life's security guards also perform a sweep of the outdoor area on a regular basis during the night to prevent loitering, public drinking, and other potential nuisance activities.

***Other Homeless Services Near the Property***

47.     The Property is located in downtown St. Louis in an area that contains a variety of other social services agencies, including many that serve homeless individuals. Some of these organizations include:

> a.  BJC Behavioral Health. 1430 Olive Street, St. Louis, MO 63103. BJC Behavioral Health is located approximately 0.1 miles from New Life. ***Exhibit 8***, Map. BJC Behavioral Health offers a wide range of comprehensive community-based behavioral health services to children

and adults in the St. Louis area. *Exhibit 9*, Website. BJC Behavioral Health also offers crisis beds for adults and children. *Exhibit 10*, Services.

b. Christ Church Cathedral, 1210 Locust Street, St. Louis, MO 63101. Christ Church is located approximately 0.1 miles from New Life. *Exhibit 11*, Map. Christ Church provides a variety of outreach to the homeless, including a free Saturday morning breakfast at which an average of 130 people are served. *Exhibit 12*, breakfast.

c. The Bridge Outreach, 1610 Olive Street, St. Louis, MO 63101. The Bridge Outreach is located approximately 0.2 miles from New Life. *Exhibit 13*, Map. The Bridge Outreach's "mission is to provide sanctuary for homeless and at-risk persons in St. Louis." *Exhibit 14*, Homepage. It is open from 6:30 a.m. to 6:00 p.m. Monday through Thursday, 6:30 a.m. to 2:00 p.m. on Friday, 6:30 a.m. to 1:00 p.m. on Saturday, and 12:00 p.m. to 6:00 p.m. on Sunday. *Id*. The Bridge Outreach welcomes approximately 350 people each day, and serves more than 3,000 meals each week. *Exhibit 15*, Services & Facilities.

d. St. Patrick Center, 800 North Tucker Boulevard, St. Louis, MO 63101. St. Patrick Center is located approximately 0.4 miles from New Life. *Exhibit 16*, Map. St. Patrick Center offers a wide variety of social services, including education, employment, financial, health, housing, and mental health and psychiatric programs.[1] It is open from 8:00 a.m. to 4:30 p.m. Monday through Friday. *Exhibit 17*, Business Hours.

e. Hope Recovery Center, 515 N. Jefferson Ave., St. Louis, MO 63103. Hope Recovery Center is located approximately 0.8 miles from New Life. *Exhibit 18*, Map. Hope Recovery Center is part of the VA St. Louis Health Care System and provided a variety of services to veterans, including housing, job, and mental health programs. *Exhibit 19*.

f. St. Vincent de Paul Society, 100 North Jefferson, St. Louis, MO 63103. St. Vincent de Paul Society is located approximately 0.9 miles from New Life. *Exhibit 20*, Map. St. Vincent de Paul Society provides various assistance, including crisis intervention, transportation services, and health services. *Exhibit 21*, What We Do.

48.     The programs and services offered at the above-noted locations, all six of which are located within less than one (1) mile of the Property, attract numerous homeless individuals within the general vicinity of New Life on a daily basis.

---

[1] A full list and descriptions of St. Patrick Center's programs is available on the St. Patrick Center website at http://www.stpatrickcenter.org/programs/.

*Interactions with City Officials Since 1976*

49.     Since the Permit was initially approved in March of 1976, Reverend Rice and other New Life officials have been in frequent contact with City officials from numerous departments.

50.     In fact, according to the City's own records, since 1993 New Life has applied for twenty eight (28) permits with the City: 14 building permits, 7 electrical permits, and 7 plumbing permits. *Exhibit 22*, Permits Report.

51.     In conjunction with these applications and the respective work done pursuant to the applications, numerous City inspectors and other officials have observed the exterior and interior of the Property on numerous occasions.

52.     While City officials at times raised minor concerns about the Property, New Life worked actively and expeditiously to resolve these problems. In fact, the on-going feedback New Life officials received from City officials and inspectors was that New Life was responding satisfactorily to all of their concerns. Significantly, at no point did any of these officials, or any other local authorities, inform or in any way suggest to Reverend Rice or any New Life official of any concerns that might prohibit New Life from using the Property as a homeless shelter serving well over 32 individuals.

53.     In August 2013, partially in response to neighbors' claims of public urination and defecation in the general proximity of the Property, New Life submitted a right of way blocking application to the City in order to place a portable toilet facility on St. Charles Street behind the Property. *Exhibit 23*.

54.     In September 2013, the City's Streets Department denied the application. *Exhibit 24*.

*Local Residents Petition the City to Declare New Life a Nuisance*

55.     On April 26, 2013, a petition was submitted to the City's Board of Public Service ("BPS"), seeking a hearing before the Board to have the Property declared a "detriment to the neighborhood" pursuant to Chapter 11.72.010 of the St. Louis City Revised Code (the "Code"). *Exhibit 25*, Petition; *Exhibit 26*, Code Chapter 11.72.010.

56.     The Petition makes various allegations regarding purportedly "detrimental" conduct at and in the general vicinity of the Property. *Ex. 25*.

57.     Under Chapter 11.72, the BPS has the authority to declare a particular premises being operated as a rooming house, boarding house, dormitory or hotel to be "a detriment to the neighborhood" based on the petition of a majority of residents within 350 feet and a public hearing. *Ex. 26*.

58.     Chapter 26.08.260 of the Code defines a "hotel" as "[a] building, other than a bed and breakfast inn, used as the abiding place of more than 20 persons who are *for compensation* lodged with or without meals." *Exhibit 27*, Code Chapter 26.08 (emphasis added).

59.     Chapter 26.08.380 defines a "rooming house" as "[a] dwelling, other than a hotel or bed and breakfast establishment, where, *for compensation*, lodging only is provided." *Id*. (emphasis added).

60.     New Life does not require compensation from guests in exchange for lodging at the Property.

*Board of Public Service Hearings on the Petition*

61.     On September 24, 2013, the City's BPS convened and determined the Petition contained verified signatures of a majority of property owners within the radius outlined in Code Chapter 11.72.010. *Exhibit 28*, 9/24/13 Tr. at 34.

62.     After verifying the signatures in the Petition, the BPS commenced a public hearing on the Petition under Code Chapter 11.72.040. *See id.* at 35-147. Both New Life and the City were represented by counsel throughout the proceeding, and both parties submitted extensive witness testimony, documentary evidence, arguments and written briefing on the matter.

63.     The BPS held several additional hearings over a more than six-month period, including on October 1, 2013, October 8, 2013, October 15, 2013, October 21, 2014, November 5, 2013, November 12, 2013, November 19, 2013, January 21, 2014, and April 1, 2014.

64.     At the November 19, 2013 hearing, there was sworn testimony given that closing New Life would likely increase nuisance activities and have "horrific results" on the community. *Exhibit 29*, 11/19/13 Hearing Tr. at 887-91, 915.

65.     The BPS was scheduled to vote on the petition on October 21, 2014, but tabled a vote at the request of Mayor Francis Slay, who requested the petitioners and New Life official meet to try to negotiate and come to a resolution. *Exhibit 30*, 10/21/14 CBS article.

66.     The parties exchanged settlement proposals, but ultimately failed to achieve a mutual resolution.

*The City Votes to Revoke New Life's Hotel Permit in December 2014*

67.     At the December 23, 2014 BPS hearing, Director Bess moved to find that the operation of New Life constitutes a detriment to the neighborhood. *Exhibit 31*, 12/23/14 Tr. at 1192. The motion was seconded by Director Waelterman. *Id.*

68.     The BPS voted 5-0 to declare New Life a detriment to the neighborhood. Director Skouby, Director Waelterman, Director Bess, Director Rice-Walker, and President Bradley all voted in favor of the motion. *Id.* at 1192-93. Director Gray abstained. *Id.* at 1193.

69.     Director Skouby then made a motion to revoke Permit 84777 effective May 12, 2015, unless on or before that date New Life provides documentation that it is in compliance with the 32-bed occupancy limit for at least 30 days, or provides documentation that New Life has obtained the necessary permit and license to operate its facility in accordance with all applicable laws, rules and regulation of the City. *Id.* at 1194-95. Director Skouby's motion was seconded by Director Waelterman. *Id.* at 1195.

70.     Director Skouby, Director Waelterman, Director Bess, Director Rice-Walker and President Bradley again all voted in favor of the motion. *Id.* at 1195. Director Gray again abstained. *Id.* at 1195-96.

71.     On February 17, 2015, the BPS published its Findings of Fact, Conclusions of Law, Decision and Order ("Order") pertaining to New Life. *Exhibit 32*.

72.     The BPS's Order outlines in detail the factors provided in Code Chapter 11.72 and whether, based on the evidence presented at the hearings, the BPS believes the factor weighs in favor of the petitioner or New Life. *Id.* at 12-26.

73. The BPS also declares the testimony of all of New Life's representatives and witnesses "not credible" with little elaboration. *Id.* at 26-29.

74. Under the Order, New Life's Permit will be revoked on May 12, 2015, unless New Life reduces the number of homeless persons it shelters to a maximum of 32 at least 30 days prior to May 12, 2015. *Id.* at 34.

75. If at any point in the future New Life exceeds the 32-person restriction, its Permit will be revoked. *Id.* at 35.

**COUNT I**
*Violation of the Religious Land Use and Institutionalized Persons Act*
*Substantial Burden Claim - 42 U.S.C. § 2000cc(a)*

76. Plaintiff incorporates by reference the allegations set forth in paragraphs 1 through 75.

77. Under RLUIPA's Substantial Burden Clause, the government cannot "impose or implement a land use regulation in a manner that imposes a substantial burden on the religious exercise of a person, including a religious assembly or institution, unless the government demonstrates that imposition of the burden on that person, assembly, or institution...is in furtherance of a compelling governmental interest; and...the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000cc(a).

78. Chapter 11.72 of the City's Revised Code constitutes a land use regulation or system of land use regulations, in that the application of this law by the City allows the City to limit and restrict New Life's use of the Property.

79. The lengthy and exhaustive administrative proceedings conducted before the City's BPS, which culminated in the BPS declaring New Life a detriment to the

neighborhood and corresponding revocation of New Life's Permit, as alleged above, amount to the City making an individualized assessment of New Life and its use of the Property.

80.     New Life's use of the Property to provide shelter for homeless individuals as a function of New Life's religious beliefs, and its intention to continue to use the Property for this purpose, is itself religious exercise by New Life.

81.     The decision by the City's BPS to declare New Life a detriment to the neighborhood and revoke New Life's Permit has imposed and continues to impose a substantial burden on New Life's religious exercise.

82.     The substantial burden the City has imposed and continues to impose on New Life's religious exercise is not in furtherance of a compelling governmental interest and is not the least restrictive means of furthering any compelling governmental interest.

83.     Accordingly, the City, through its declaration that New Life is a detriment to the neighborhood and its revocation of New Life's Permit, has violated New Life's rights recognized under 42 U.S.C. § 2000cc(a).

84.     As a direct result of the City's violation of New Life's rights under 42 U.S.C. § 2000cc(a) of the Act, as alleged above, New Life is suffering irreparable harm for which there is no adequate remedy at law, and New Life is entitled to recover equitable relief, compensatory and nominal damages, costs and attorney fees.

### COUNT II
*Violation of the Rights to Freedom of Assembly and Speech*
*as Guaranteed by the First Amendment to the United States Constitution (42*
*USC § 1983)*

85.     Plaintiff incorporates by reference the allegations set forth in paragraphs 1 through 84.

86.     All acts alleged herein of the City were done and are continuing to be done under the color of state law.

87.     New Life's ministry of offering shelter to homeless individuals amounts to protected expressive conduct under the First Amendment.

88.     By revoking New Life's Permit, the City has unconstitutionally interfered with New Life's constitutionally protected speech.

89.     Revoking New Life's Permit does not further any substantial governmental interest.

90.     The content- and viewpoint-based decision and restrictions of the City precluding New Life from using its Property to shelter the homeless are not supported by a compelling governmental interest and are not narrowly tailored to accomplish the compelling governmental interest.

91.     The City's decision to revoke New Life's Permit and prohibit New Life from offering shelter to the homeless is not a legitimate time, place, or manner regulation, as it does not serve a significant government interest and does not leave open ample alternative channels for communication.

92.     The City's Revised Code, to the extent that Chapter 11.72 affords the City's BPS unfettered discretion to decide whether to permit or prohibit religious speech and expression, and does not contain in that process the procedural safeguards necessary for a speech-related permit scheme, constitutes a prior restraint on Plaintiff New Life's speech in violation of the First Amendment to the United States Constitution.

93.     By discriminating against Plaintiff New Life by revoking New Life's Permit and effectively precluding New Life from offering shelter to the homeless, the

City has violated and continues to violate New Life's right to the freedom of speech under the First Amendment and right to assemble and associate for the purpose of engaging in activities protected by the First Amendment.

94.    As a direct result of the City's violation of New Life's First Amendment rights to the freedom of speech and assembly, as alleged above, New Life is suffering irreparable harm for which there is no adequate remedy at law and New Life is entitled to recover injunctive relief, compensatory and nominal damages, costs and attorney fees.

## COUNT III
### *Violation of the Right to Free Exercise of Religion*
### *Guaranteed by the First Amendment to the United States Constitution (42 USC § 1983)*

95.    Plaintiff incorporates by reference the allegations set forth in paragraphs 1 through 94.

96.    The Free Exercise Clause of the First Amendment to the U.S. Constitution, which has been applied to the states through the Fourteenth Amendment, provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." U.S. CONST. amend. I.

97.    Governmental enforcement of laws or policies that substantially burden the exercise of sincerely held religious beliefs is subject to strict scrutiny. *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 546 (1993).

98.    New Life's practice of providing overnight shelter to homeless individuals is an exercise of New Life's sincerely held religious beliefs.

99.    By revoking New Life's Permit, the City has substantially burdened New Life's ability to fully exercise its sincerely held religious beliefs.

100.    The City's decision to revoke New Life's Permit and prevent New Life from providing overnight shelter to homeless individuals results in a substantial burden on and discrimination against New Life's religious exercise, and is not justified by or narrowly tailored to further any compelling governmental interest.

101.    As a direct result of the City's violation of New Life's right to the free exercise of religion, as alleged above, New Life is suffering irreparable harm for which there is no adequate remedy at law and New Life is entitled to recover injunctive relief, compensatory and nominal damages, costs and attorney fees.

### *Violation of Missouri Religious Freedom Restoration Act*
### *Mo. Rev. Stat. Sec. 1.302*

102.    Plaintiff incorporates by reference the allegations set forth in paragraphs 1 through 101.

103.    The Missouri Religious Freedom Restoration Act ("RFRA") protects organizations and individuals from government-imposed restrictions on religious exercise.

104.    Under RFRA, government entities cannot restrict another entity's religious exercise, even if the restriction results from a rule of general applicability, unless the government entity demonstrates the burden it has imposed furthers a compelling governmental interest and is the least restrictive means of furthering that interest.

105.    New Life's use of the Property to provide shelter for homeless individuals as a function of New Life's religious beliefs, and its intention to continue to use the Property for this purpose, is itself religious exercise by New Life.

106.    The decision by the City's BPS to declare New Life a detriment to the neighborhood and revoke New Life's Permit has imposed and continues to impose a substantial burden on New Life's religious exercise.

107.    The substantial burden the City has imposed and continues to impose on New Life's religious exercise is not in furtherance of a compelling governmental interest and is not the least restrictive means of furthering any compelling governmental interest.

108.    Accordingly, the City, through its declaration that New Life is a detriment to the neighborhood and its revocation of New Life's Permit, has violated New Life's rights recognized under RFRA, Missouri Revised Statute Section 1.302.

109.    As a direct result of the City's violation of New Life's rights under Missouri Revised Statute Section 1.302, as alleged above, New Life is suffering irreparable harm for which there is no adequate remedy at law, and New Life is entitled to recover equitable relief, compensatory and nominal damages, and costs.

### COUNT IV
### *Violation of the Right to Free Speech*
### *Guaranteed by Article I, Section 8 of the Missouri Constitution*

110.    Plaintiff incorporates by reference the allegations set forth in paragraphs 1 through 109.

111.    The decision of the City's BPS to revoke New Life's Permit impermissibly limits New Life's ability to exercise its free speech rights by prohibiting or severely impeding New Life from providing overnight shelter to homeless individuals at the Property and from fully and effectively expressing its religious message and ministry.

112.    The decision of the City's BPS to revoke New Life's Permit does not serve compelling governmental interests and is not narrowly tailored to serve any such interests.

113.    Accordingly, the decision to revoke New Life's Permit and prohibit or otherwise severely impede New Life's ability to provide overnight shelter to homeless individuals at the Property violates Article I, Section 8 of the Missouri Constitution.

114.    As a direct result of the City's violation of New Life's right to free speech under Article I, Section 8 of the Missouri Constitution, as alleged above, New Life is suffering irreparable harm for which there is no adequate remedy at law and New Life is entitled to injunctive relief.

**COUNT V**
*Violation of the Right to Free Exercise of Religion*
*Guaranteed by Article I, Section 5 of the Missouri Constitution*

115.    Plaintiff incorporates by reference the allegations set forth in paragraphs 1 through 114.

116.    New Life's practice of providing overnight shelter to homeless individual is an exercise of New Life's sincerely held religious beliefs.

117.    By revoking New Life's hotel permit, the City has substantially burdened New Life's ability to fully exercise its sincerely held religious beliefs, in violation of Article I, Section 5 of the Missouri Constitution.

118.    The decision of the City's BPS to revoke New Life's Permit threatens and substantially burdens New Life and its members' ability to freely exercise their religious beliefs as permitted under Article I, Section 5 of the Missouri Constitution, and that burden is imminent.

22

119.    The decision to revoke New Life's Permit and prohibit or otherwise severely impede New Life's ability to provide overnight shelter to homeless individuals amounts to a substantial burden imposed on religious exercise, is not in furtherance of a compelling governmental interest, and is not the least restrictive means of furthering any compelling governmental interest.

120.    Accordingly, as set forth herein, the City has violated New Life's rights recognized under the Missouri Constitution and as a direct result of the City's violation of New Life's right to the free exercise of religion under Article I, Section 5 of the Missouri Constitution, as alleged above, New Life is suffering irreparable harm for which there is no adequate remedy at law and New Life is entitled to injunctive relief.

## COUNT VI
### *Violation of the Right to Freedom of Association*
### *Guaranteed by Article I, Section 9 of the Missouri Constitution*

121.    Plaintiff incorporates by reference the allegations set forth in paragraphs 1 through 120.

122.    The decision of the City's BPS to revoke New Life's Permit limits the ability of New Life and its members to assemble and associate for purposes of its religious activities—including providing overnight shelter to homeless individuals while ministering to these individuals through religious instruction, life skills training, job skills training, and other means—by prohibiting and severely impeding New Life from offering shelter to homeless individuals at the Property.

123.    The decision of the City's BPS to revoke New Life's Permit has substantially burdened the ability of New Life and its members to associate in furtherance

of its religious mission to provide safe and secure overnight shelter for homeless individuals.

124.    The burden resulting from the City revoking New Life's Permit, thereby denying New Life's members' denying overnight stay to associate for religious purposes is not necessary to serve any compelling governmental interest.

125.    Accordingly, the City has violated New Life's right to the freedom of speech under the Missouri Constitution.

126.    As a direct result of the City's violation of New Life's rights under Article I, Section 8 of the Missouri Constitution, as alleged above, New Life is suffering irreparable harm for which there is no adequate remedy at law and New Life is entitled to injunctive relief.

### Relief Requested

WHEREFORE, Plaintiff prays for a judgment against Defendant and that this Honorable Court:

a.    Adjudge, decree and declare the rights and other legal relations of the parties to the subject matter in controversy in order that such declaration shall have the force and effect of final judgment and that the Court retains jurisdiction of this matter for the purpose of enforcing the Court's Order;

b.    Pursuant to 28 U.S.C. § 2201, declare the decision by Defendant to require Plaintiff to possess a hotel permit to use a portion of the Property as a homeless shelter in the City's Central Business District to be in violation of the Religious Land Use and Institutionalized Persons Act, the Free Speech, Assembly, and Exercise Clause of the First Amendment to the United States Constitution, the Missouri Religious Freedom Restoration Act, and parallel clauses to the Missouri Constitution, and further declare that Plaintiff is permitted as of right to use the Property as a religious organization for all of its intended and stated purposes;

c.    Pursuant to 28 U.S.C. § 2202, Fed. R. Civ. P. 64, 42 U.S.C. § 1983, 42 U.S.C. § 2000cc-4 and 71 P.S. § 2401, permanently enjoin Defendant from denying Plaintiff the right to use the Property as an overnight shelter

for the homeless, and (ii) preliminarily and permanently enjoin Defendant from enforcing its Revised Code, Building Code or any other code to prevent Plaintiff from using the Property as a religious assembly that provides overnight shelter for the homeless, and to process and issue all permits and grant all other rights and privileges to Plaintiff to use the Property as a religious assembly that offers overnight shelter for the homeless;

d.  Pursuant to 28 U.S.C. § 2202, Fed. R. Civ. P. 65, 42 U.S.C. § 1983, 42 U.S.C. § 1988, and 42 U.S.C. § 2000cc-4, award Plaintiff compensatory and nominal damages;

e.  Pursuant to 42 U.S.C. § 1988, 42 U.S.C. § 2000cc-4(d), Fed. R. Civ. P. 54(d), and other applicable law, award Plaintiff its reasonable attorney fees and costs; and

f.  Grant such other and further relief as the Court deems equitable, just and proper.


Respectfully submitted,

**Dalton & Tomich plc**

/s *Daniel P. Dalton*
By: Daniel P. Dalton
Attorney for Plaintiff – *Pro Hac Vice pending*
719 Griswold, Suite 270
Detroit, MI 48226
Tel. 313.859.6000
Fax 313.859.8888
ddalton@daltontomich.com

**Brown & James P.C.**

/s/ *Todd A. Lubben*
By: Todd A. Lubben, 54746MO
Attorney for Plaintiff
800 Market Street, Suite 1100
St. Louis, MO 63101-2501
Tel. 314.421.3400
Fax 314.421.3128

**Verification**

Pursuant to 28 USC § 1746, I, Reverend Larry Rice, declare under penalty of perjury that I have personal knowledge of matters contained in paragraphs 6 through 76 of this Complaint and that the allegations contained therein are true and accurate.

Signed this 27th day of February, 2015.

New Life Evangelistic Center, Inc.

By:  Reverend Larry Rice
Its:   Founder and Director

**Demand for Trial by Jury**

The Plaintiff herein demands a trial by jury in this cause of action.

Respectfully submitted,

**DALTON & TOMICH, PLC**

/s/ Daniel P. Dalton
Daniel P. Dalton (P 44056)
Lead Counsel for Plaintiff
*Pro Hac Vice Admission pending*
719 Griswold St., Suite 270
Detroit, MI  48226
313.859.6000
313.859.8888 (fax)
ddalton@daltontomich.com
