**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | |
|---|---|
| NEW LIFE EVANGELISTIC CENTER, INC., ) <br> A Missouri non-profit corporation, ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> CITY OF ST. LOUIS, MISSOURI, ) <br> A Missouri municipal corporation, ) <br> ) <br> Defendant. ) <br> _____ ) | Case No. 4:15-cv-395 <br><br> Jury Trial Demanded |

**PLAINTIFF'S MEMORANDUM IN SUPPORT OF ITS**
**MOTION FOR PRELIMINARY INJUNCTION**

**Introduction**

Since 1976, in keeping with Biblical commands, Plaintiff, New Life Evangelistic Center ("New Life" or the "Church") has been serving and ministering to the homeless, including providing overnight shelter, at a building located at 1411 Locust Street (the "Property") in the Central Business District of St. Louis (the "City"), a zoning district that allows the use of property for a Church and Shelter as of right. On February 17, 2015, the City of St. Louis Ordered the Church to end the 40 year religious mission on or before May 12, 2015. New Life has filed this complaint, and the instant Motion, as this Court is its last resort to allow it to provide for the most vulnerable in society as mandated by its religious mission. The Church respectfully requests that this Court grant its motion and allow it to remain as the religious mission is permitted by the Religious Land Use and Institutionalized Persons Act, 42 U.S.C. § 2000 cc, and the Free Exercise Clause of the First Amendment.

1

## Facts

New Life refers the Court to its attached Statement of Uncontroverted Facts[1] for background specifically significant to this motion.

## Standard of Review

In determining whether to grant a preliminary injunction, the Court must consider four factors: (1) the probability of the movant's success on the merits; (2) the threat of irreparable harm to the movant; (3) the balance between this harm and the injury that granting the injunction will inflict on other interested parties; and (4) whether the issuance of the preliminary injunction is in the public interest. *Coca-Cola Co. v. Purdy*, 382 F.3d 774, 782 (8th Cir. 2004). When a party seeks an injunction on the basis of a potential First Amendment violation, the likelihood of success on the merits is often the determinative factor. *Phelps-Roper v. Nixon*, 545 F.3d 685, 690 (8th Cir. 2008). With regard to showing irreparable harm, Supreme Court precedent is clear: "Loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976). Thus when a constitutional right is impaired, a finding of irreparable injury is mandatory. *Id.*

## Legal Arguments

**I.     New Life is likely to succeed on the merits of the complaint**

The Church has offered two reasons for the Court to find why it is likely to succeed on the merits of the complaint. The first is that the decision of the City to effectively stop the ministry to the homeless violates the "substantial burden" provision of RLUIPA. See, 42 U.S.C. § 2000 cc. (1). The second reason is that the actions taken by the City violate the Free Exercise Clause

---

[1] As Plaintiff explains in the Statement of Uncontroverted Facts, for ease of reference, the exhibits Plaintiff references in the instant Memorandum in Support and in the Statement of Uncontroverted Facts follow the same exhibit numbering in Plaintiff's Verified Complaint. For this reason, certain exhibits in these documents may not appear in chronological order.

of the First Amendment. For these reasons, the Church respectfully requests that this Court grant its motion for a Preliminary Injunction.

### a. The City of St. Louis violated the Substantial Burden provision of RLUIPA

#### i. Serving the Homeless is a religious exercise under RLUIPA

Congress provided that RLUIPA forbids a city from implementing a land-use regulation that imposes a substantial burden on religious exercise unless it can show the regulation is the least restrictive means to achieve a compelling governmental interest. 42 U.S.C. § 2000cc(a)(1). RLUIPA defines "religious exercise" broadly to include "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C. § 2000cc-5(7)(A); *Burwell v. Hobby Lobby*, 134 S. Ct. 2751, 2762 (2014). All sincere religious beliefs are protected. *Shakur v. Schriro*, 514 F.3d 878, 884 (9th Cir. 2008) ("[I]t is not within the judicial ken to question the centrality of particular beliefs or practices to a faith, or the validity of particular litigants' interpretations of those creeds."); *Hobby Lobby*, 134 S. Ct. at 2798 (Ginsburg, J., dissenting) (agreeing with the majority that a court must accept as true allegations that a plaintiff's beliefs about its own religious activity are sincere and religious in nature). Further, "[t]he use . . . of real property for the purpose of religious exercise shall [itself] be considered to be religious exercise." 42 U.S.C. § 2000cc-5(7)(B). "[T]he exercise of religion involves not only belief and profession but the performance of . . . physical acts that are engaged in for religious reasons." *Hobby Lobby*, 134 S. Ct. at 2770 (internal quotation marks omitted).

The United States has made clear that it considers homeless ministry to constitute religious exercise.[2] (religious exercise includes "operation of homeless shelters, soup kitchens, and other social services"). Here, the Church's use of its property to minister to the homeless is

---

[2] See, http://www.justice.gov/crt/rluipa_q_a_9-22-10.pdf.

religious exercise. The Church follows its understanding of Christ's commandment that his followers minister to the poor. Courts have recognized that such a ministry is "in every respect" "religious activity and a form of worship."[3] Indeed, "the concept of acts of charity as an essential part of religious worship is a central tenet of all major religions." *W. Presbyterian Church*, 862 F. Supp. at 544 (noting Muslims, Hindus, Jews, and Christians all hold to such teachings). Therefore, the use of real property for the religious exercise of ministering to the homeless is itself religious activity under 42 U.S.C. § 2000cc-5(7)(B).

### b. Denying the Church its mission of providing shelter for the homeless is a substantial burden under RLUIPA.

Congress provided that no government "shall impose or implement a land use regulation in a manner that imposes a substantial burden on the religious exercise of a person, including a religious assembly or institution." 42 U.S.C. § 2000cc-1. The term "substantial burden" was intentionally not defined in the Act leaving Court's to interpret the same. The only guidance Congress provided is that RLUIPA must be broadly construed. 42 USC § 2000cc-3(g)

The Eighth Circuit is unique in that there are no published decisions defining "substantial burden" within the land use context of RLUIPA. Therefore, decisions from other circuits are instructive. A substantial burden is one that is "oppressive to a significantly great extent" or that puts "substantial pressure" "to modify . . . behavior and to violate . . . beliefs." *Guru Nanak Sikh*

---

[3] *W. Presbyterian Church v. Bd. of Zoning Adjustment of D.C.*, 862 F. Supp. 538, 546 (D.D.C. 1994); accord *Fifth Ave. Presbyterian Church v. City of New York*, No. 01 Civ. 11493(LMM), 2004 WL 2471406, at *2 n.3 (S.D.N.Y. Oct. 29, 2004); affirm, 177 Fed. Appx. 198, 2006 U.S. App. LEXIS 10731 (2nd Cir., 2006); Cert denied, 549 U.S. 954, 127 S. Ct. 387, 166 L. Ed. 2d 271, 2006 U.S. LEXIS 7532, 75 U.S.L.W. 3194 (2006). ("[S]ervices to the homeless have been judicially recognized as religious conduct, within the ambit of the First Amendment."); *Stuart Circle Parish v. Bd. of Zoning Appeals*, 946 F. Supp. 1225, 1236-37 (E.D. Va. 1996); *St. John's Evangelical Lutheran Church v. City of Hoboken*, 479 A.2d 935, 938 (N.J. Super. Ct. Law Div. 1983) ("In view of the centuries old church tradition of sanctuary for those in need of shelter and aid, St. John's and Case: its parishioners in sheltering the homeless are engaging in the free exercise of religion.").

*Soc'y of Yuba City v. Cnty. of Sutter*, 456 F.3d 978, 988 (9th Cir. 2006) (internal quotation marks omitted). Permit denials meet this standard when they leave a church with "no ready alternatives, or where the alternatives require substantial delay, uncertainty, and expense." *Int'l Church of Foursquare Gospel v. City of San Leandro, CA.,* 673 F.3d 1059, 1068 (9th Cir., 2011) (internal quotation marks omitted). Among other things, the "practical considerations" of finding another "suitable" property can amount to a substantial burden. *Id.* at 1068, 1069. Similarly, the Eleventh Circuit has held that "a substantial burden can result from pressure that tends to force adherents to forego religious precepts or from pressure that mandates religious conduct." *Midrash Sephardi, Inc. v. Town of Surfside,* 366 F.3d 1214, 1227 (11th Cir. 2004).

Decisions from this Court that define "substantial burden" under the Religious Freedom Restoration Act (RFRA) are also instructive. This Court has held government action amounts to a substantial burden "if it (1) requires participation in an activity prohibited by a sincerely held religious belief, (2) prevents participation in conduct motivated by a sincerely held religious belief, or (3) places substantial pressure on an adherent...to engage in conduct contrary to a sincerely held religious belief." *Archdiocese of St. Louis v. Burwell*, 2014 U.S. Dist. LEXIS 88918 at *15 (E.D. Mo. June 30, 2014) (quotations omitted).

Applying the standards to this instant case, it is clear that the City's decision to close the ministry of the Church imposes a substantial burden on the Church's religious exercise as it prevents participation in conduct motivated by a sincerely held religious belief, and, places substantial pressure on an adherent...to engage in conduct contrary to a sincerely held religious belief. *Archdiocese of St. Louis,* 2014 U.S. Dist. LEXIS 88918 at *15 As New Life has made clear, it is called by God and compelled by scripture to serve the homeless, which includes providing homeless persons with shelter. **Ex. 33** ¶¶ 2-8; **SOF** ¶¶ 2-7. New Life purchased the

Property in 1975 for the purpose of answering this call and offering shelter and related services to homeless individuals in the St. Louis area. *Ex. 33* ¶ 9; **SOF** ¶ 8. For nearly forty (40) years, the City allowed New Life to provide such services in furtherance of its religious beliefs with minimal interference or obstruction at the present location.. *Ex. 33* ¶ 19; **SOF** ¶ 12.

Further, the Church has no alternatives allowing it to perform its religious ministry to the homeless. *Ex. 33*. The Church has investigated its options and to continue its religious ministry at a single location it would have to sell its current property and raise at least millions of dollars to acquire a new location. "[A] law that operates so as to make the practice of . . . religious beliefs more expensive [even] in the context of business activities imposes a burden on the exercise of religion." *Hobby Lobby,* 134 S. Ct. at 2770 (internal quotation marks omitted); accord *Int'l Foursquare Gospel,* 673 F.3d at 1068 (substantial burden shown when alternative would require substantial delay, uncertainty, and expense); *Westchester Day Sch. v. Vill. of Mamaroneck*, 504 F.3d 338, 349 (2d Cir. 2007) (same); *Saints Constantine & Helen Greek Orthodox Church, Inc. v. City of New Berlin*, 396 F.3d 895, 901 (7th Cir. 2005) (same). And even if the Church could relocate, such relocation would take time, especially in light of the uncertainty of either obtaining a permit at an alternative location or finding a location not requiring one; in the meantime, the Church would be forced to cease its ministry to the homeless

More importantly, the City has a crisis of homelessness. According to the *New York Times*, officials estimate that there are more than 1,300 homeless people in St. Louis, and nearly half of them rely on emergency shelters like New Life's center. See, *In St. Louis Battle, It's New Lofts vs. Homeless Shelter*, http://bit.ly/1LWoPUw.

There is no alternative place for the homeless to go. According to the BPS's decision, New Life must either severely compromise its religious beliefs by drastically reducing the

number of homeless persons it serves or risk losing its Permit and being completely barred from offering shelter to homeless persons at the Property. SOF ¶¶ 25-26, 41-42; *Ex. 32*.

By preventing New Life from exercising its sincerely held religious beliefs by offering shelter and other related services to the homeless, the City has "place[d] more than inconvenience" on the Church's religious exercise, since the BPS's decision effectively prohibits New Life from engaging in conduct compelled by its religious beliefs. *Foursquare*, 634 F.3d at 1044-45. The BPS's decision "puts substantial pressure on [the Church] to modify [its] behavior and to violate [its] beliefs." *Id.* at 1045. The decision also prevents the Church from "participat[ing] in conduct motivated by a sincerely held religious belief." *Burwell*, 2014 U.S. Dist. LEXIS 88918, at *15.

Based on the BPS's decision, the City has forced New Life and its members to either drastically reduce the number of homeless persons it serves in order to maintain its Permit, or continue sheltering the number of homeless persons it presently serves, as it feels called and compelled to do, and consequently risk incurring a wide range of potential civil and criminal penalties from the City for doing so. Clearly, either of these options require New Life to significantly inhibit and compromise its sincerely held religious beliefs.

In sum, especially given the broad nature in which Congress intends RLUIPA to be interpreted, the City has clearly violated RLUIPA's Substantial Burden provision

    c.    **The City's Decision did not further a Compelling Government Interest**

Once there is a finding that the action of the City is a substantial burden under RLUIPA, the burden of proof turns to the City to demonstrate that imposing such a burden is in furtherance of a compelling government interest and the least restrictive means of furthering that compelling interest. *See* 42 U.S.C. § 2000cc(a)(1); 42 U.S.C. § 2000cc-2(b). Compelling interests are

"interests of the highest order." *Lukumi*, 508 U.S. at 546. "[O]nly the gravest abuses, endangering paramount interests, give occasion for permissible limitation." *Sherbert*, 374 U.S. at 406. "[D]emonstrating a compelling interest and showing that it has adopted the least restrictive means of achieving that interest is the most demanding test known to constitutional law." *City of Boerne v. Flores*, 521 U.S. 507, 534 (1997). Even a "substantial" government interest does not rise to the level of a "compelling" government interest. *Advantage Media*, 379 F. Supp. 2d at 1042 (citation omitted). The government must "show a compelling interest…in the particular case at hand, not a compelling interest in general." *Westchester Day Sch. v. Vill. of Mamaroneck,* 504 F.3d 338, 353 (2d Cir. 2007).

Here, the City cannot show that the BPS's decision furthers an interest "of the highest order." *Lukumi*, 508 U.S. at 546. The BPS's Order asserts a variety of public safety factors, delineated at length in Code Chapter 11.72, that contributed to its decision to declare New Life a "detriment to the neighborhood" and revoke New Life's Permit. ***Ex. 32***; ***Ex. 26***.

It is important to recognize that the City never found that the Church building is a "nuisance." In other words, there has never been a finding that the building is zoned improperly, that it is unsafe or violates building codes. Rather, the City assumed, through coordinated testimony of the developer and its own witnesses and choosing, to ignore the witnesses of the Church and conclude that the homeless who find shelter at the Church create a nuisance. The City has allowed, and some cases encouraged, New Life to conduct its ministry and services for nearly four decades at the Property, during which time City officials not only directed the homeless to the Church, but also made frequent visits to and inside the Property to insure that building code and safety requirements were being met. ***Ex. 33*** ¶ 15-17; **SOF** ¶¶ 21-23. At no point did any City official raise concerns about the number of homeless persons New Life was

sheltering. ***Ex. 32*** ¶ 18; **SOF** ¶ 24. Rather, the City was fully aware of New Life's operations and the number of persons it serves. *Id.* In fact, it was only after a local property developer who owns and manages several properties in the Property's immediate vicinity initiated a petition to have the City revoke New Life's Permit that the City took any sort of concern with New Life's homeless services. **SOF** ¶ 25; ***Ex. 25***.

The City has many ways to address the "nuisance" issue. First, it can enforce its own municipal codes to address issues such as loitering[4] or noise.[5]

Second, the City could enforce its laws with respect to the patrons of the bars, restaurants and nightclubs within the vicinity of the Church. The City boasts about the rich mix of cultures and culinary interests, "from Italian and German fare to Bosnian and Vietnamese cuisine, there's something to satisfy every craving at the hundreds of one-of-a-kind restaurants dotting the city's culinary landscape" in the downtown area."[6] All of these entities must create the same noise, traffic, loitering behavior complained of by the City.

Third, it can consider the impact of the the six (6) other organizations within less than one (1) mile of New Life that also provide a wide range of services to the homeless. **Dkt. No. 1**, ¶ 47(a)-(f); ***Exs. 8-21***; ***Ex. 29, Testimony of Faye Abram*** at 888:15-17 (noting homeless person are "returning [to the area] because there are a number of services that are available in the locality that they take advantage of."); *see **id.*** at 890:8-12 ("So, it's noteworthy that near New Life Evangelistic Center there are in fact a number of homeless facilities and services and resources that are there, and which is good, but that is precisely why they continue to return to

---

[4] http://bit.ly/1FIvGNf
[5] http://bit.ly/1898EEe
[6] http://explorestlouis.com/visit-explore/eat-drink/

the area."). While the City surely has an interest in protecting the health and safety of its residents, this general interest is inadequate, as the City must show a compelling interest "in the particular case at hand." *Westchester Day Sch.*, 504 F.3d at 353.

It is also important to recognize the BPS's glaringly illogical reasoning for its decision. Apparently, the City believes that drastically reducing the number of persons who stay at New Life will solve the purported nuisance issues it alleges New Life's guests cause. Under either potential result of the BPS's decision—New Life reducing the people it shelters to 32 or having its Permit revoked and consequently sheltering no people—hundreds of homeless persons who were once sheltered at New Life will be forced onto the streets. Thus, the BPS's decision will in all likelihood *worsen* any neighborhood issues the BPS used to justify its decision in the first place. In fact, testimony presented during the BPS hearing process indicated that closing New Life will likely *increase* any nuisance activities in the area. ***Ex. 29*** at 887-891. One person went so far as to claim that shutting down New Life will have "horrific results" in the community, for both the homeless people being displaced as well as persons who live and spend time in that area. *Id.* at 915:10-21. The BPS's counterintuitive reasoning strengthens New Life's position that the City has failed to show the BPS's decision furthers any compelling governmental interests.

### d. The City's Decision is not the Least Restrictive Means

Even assuming the Court finds the City's interests to be compelling, the City still bears the burden of showing it utilized the least restrictive means to achieve these interests. 42 USC § 2000cc(a)(1)(B). The least restrictive means requirement imposes a "heavy burden" on the government, and is even more stringent than strict scrutiny's narrow tailoring requirement. *Bd. of Trs. v. Fox*, 492 U.S. 469, 477-78 (1989). Under this test, the municipality must show "[there are] no alternative forms of regulation" that would further its purported governmental

interests. *Sherbert,* 374 U.S. at 407. "If a less restrictive means is available for the Government to achieve its goals, the Government ***must*** use it." *United States v. Playboy Entm't Group, Inc.,* 529 U.S. 803, 815 (2000) (emphasis added). As such, the City must produce actual evidence that the decision was the least restrictive action the City could have taken to further its interest in this case. *See Fegans v. Norris,* 537 F.3d 897, 904 (8th Cir. 2008); *see also Murphy v. Mo. Dep't of Corr.,* 372 F.3d 979, 989 (8th Cir. 2004). The City unquestionably failed to carry its burden.

"Homeless" and "criminal" are not synonyms. Outright denial of the Church's right to minister to the homeless at its place of worship, or reducing the number of beds at the Church, is not the least restrictive means of preventing crime if the City or the Church can take steps to prevent crime without outlawing the homeless ministry. For example, the City could address crime in the neighborhood by increased enforcement of its criminal laws. In 1939, the Supreme Court rejected a city's attempt to prohibit distribution of literature on a public street, explaining that "[t]here are obvious methods of preventing littering. Amongst these is the punishment of those who actually throw papers on the streets." *Schneider v. State (Town of Irvington)*, 308 U.S. 147, 162 (1939). And recently, the Supreme Court recognized that protecting religious freedom guaranteed by RLUIPA may require the government to take action and to bear the cost of that action: "[B]oth RFRA and its sister statute, RLUIPA, may in some circumstances require the Government to expend additional funds to accommodate citizens' religious beliefs." *Hobby Lobby,* 134 S. Ct. at 2781.

It is the City's burden to show that there are no less restrictive means, see 42 U.S.C. § 2000cc,—that increased enforcement of its criminal laws in the neighborhood surrounding the Church (alone or in conjunction with conditions placed on the permit) would not protect the City's compelling interest. It has not met that burden.

Here, during the lengthy BPS proceedings and in its written Order, the City showed no evidence that it considered *any* alternatives to address the petitioner's apparent concerns about New Life other than to revoke New Life's Permit under Chapter 11.72. Thus, the BPS's decision will certainly not decrease any nuisance activities caused by homeless persons in the area, and in reality will likely *increase* such problems given the hundreds of additional homeless persons forced to sleep on the streets if New Life is forced to close or drastically reduce the number of persons it serves nightly.

In short, the City has not shown compelling governmental interests to support the BPS decision, nor has it provided any evidence whatsoever that the BPS decision was the least restrictive means of achieving its interests. Since New Life has shown the City's actions have imposed a substantial burden on the Church's religious exercise, and since the City has failed to show its actions furthered a compelling interest and were the least restrictive means of furthering said interest, New Life is likely to succeed on the merits of its Substantial Burden claim.

## II.  New Life is likely to succeed on the merits of the complaint as the City of St. Louis has violated New Life's right to Free Exercise of religion under the First Amendment of the United States Constitution.

New Life's use of the Property to serve the homeless, which includes providing overnight shelter, constitutes religious exercise protected by the First Amendment. *Fifth Ave. Presbyterian Church, supra.* New Life is scripturally mandated and called by God and scripture to serve ALL the homeless and less fortunate members of society. *Ex. 33* ¶¶ 2-8; **Statement of Uncontroverted Facts (SOF)** ¶¶ 2-7. [7] It has done so at the same location in the City for nearly 40 years with little issue. *Ex. 33* ¶ 19; **SOF** ¶ 12. Several courts have recognized that such a religious ministry "in every respect" amounts to "religious activity and a form of worship."

---

[7] Matthew 25:31-46, New International Version (NIV)

Nonetheless, the City will likely argue that it has a compelling governmental interest in the "great good" by eliminating a public nuisance as it portended to establish in its hearing and that requiring the Church to secure a hotel permit and limit its guest to 32 each evening is a "Compelling governmental interest." This argument must be rejected as the Free Exercise inquiry does not end at whether or not the City has a "compelling governmental interest." *Church of Lukumi Babalu Aye v. City of Hialeah*, 508 U.S. 520, 531 (1993). Rather, it is whether the decision of the City to close the Church, require it to secure a hotel permit, and limit its guest to 32, is the "*least restrictive means*" of achieving the compelling governmental interest. *Church of Lukumi Babalu Aye,* 508 U.S. at 546. To prove it used the least restrictive means, a government must show it could not achieve its interests by narrower state action that burdened the plaintiff to a lesser degree. *Elsinore Chr. Ctr. v. City of Lake Elsinore,* 270 F. Supp. 2d 1163, 1174-75 (C.D. Cal. 2003. Under strict scrutiny, if a less restrictive alternative is available, the government "***must*** use that alternative." *U.S. v. Playboy Ent. Group*, 529 U.S. 803, 813 (2000) (emphasis added).

As noted previously, the City has many ways to address the public nuisances it asserts arise out of the Church, namely, enforcing its laws concerning loitering, public intoxication, littering, noise – all of which are found in the municipal code. Because the BPS decision impairs New Life's First Amendment free exercise rights, a finding of irreparable injury is mandatory. *Elrod*, 472 U.S. at 373. Therefore, New Life has a strong likelihood of success on the merits of its Free Exercise claims under the First Amendment.

**II. New Life Will Sustain Irreparable Harm if a Preliminary Injunction is Not Granted**

A plaintiff "seeking preliminary relief [must] demonstrate that irreparable injury is likely in the absence of an injunction. *Winter v. NRDC*, 555 U.S. 7, 22 (2008). "A loss of First

Amendment freedoms, even for minimal periods of time, unquestionably constitutes irreparable injury." *Elrod*, 427 U.S. at 373; *see also* 11A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 2948.1 (2d ed. 1995) ("When an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary."). It necessarily follows that RLUIPA violations also constitute irreparable harm, as RLUIPA is broadly construed to protect First Amendment freedoms and religious exercise. *See* 42 U.S.C. § 2000cc-3(g). Thus, New Life has shown it is suffering irreparable harm based on the City's actions.

### III. The Balance of Hardships Weighs in Plaintiff's Favor

In weighing the balance of hardships between the Church and the City, it is apparent the Church will face the greater hardship if an injunction does not issue. Generally, balancing the equities generally "favors the constitutionally protected freedom of expression." *Nixon*, 545 F.3d at 690. Here, without an injunction, the City will continue to interfere with, inhibit, and suppress the Church's ability to freely exercise its religious beliefs, a fundamental right that is fiercely protected by the First Amendment and RLUIPA. Accordingly, in weighing the potential hardships at issue, the balance clearly weighs in in favor of issuing the preliminary injunction.

### IV. A Preliminary Injunction Will Serve the Public Interest

The public interest is served whenever First Amendment and related religious liberty rights are protected with the issuance of a preliminary injunction. "[I]t is always in the public interest to protect constitutional rights." *Nixon*, 545 F.3d at 690. The City's decision that New Life seeks to enjoin through this motion directly impacts the Church's federal constitutional and statutory rights to the free exercise of its religion. As such, the issuance of the requested preliminary injunction will serve the public interest as a matter of law.

Accordingly, the Court should issue the injunction, as it will serve the public interest.

## Conclusion

By granting this Motion, the Court will simply preserve the status quo and allow New Life to continue carrying out its religious ministry of providing vital services and shelter to the St. Louis homeless community until the parties have a full and fair opportunity to adjudicate the claims at hand. Plaintiff New Life Evangelistic Center has met all four elements necessary for this Court to issue a Preliminary Injunction. Thus, Plaintiff respectfully requests that this Court GRANT its Motion for Preliminary Injunction.

Respectfully submitted,

**BROWN & JAMES, P.C.**

*/s/ Todd A. Lubben*
Attorney for Plaintiff, #54746MO
800 Market Street, Suite 1100
St. Louis, MO 63101-2501
tlubben@bjpc.com
(314) 242-5325 direct dial

And

**Dalton & Tomich, PLC**

*/ s / Daniel P. Dalton*
Attorney for Plaintiff
*Pro Hac Vice – Pending*
(Mich Bar No, P 44056)
719 Griswold Street, Suite 270
Detroit, Michigan 48226
313.859.6000
ddalton@daltontomich.com

12203541