# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

**NEW LIFE EVANGELISTIC CENTER, INC.,** )
)
)
**Plaintiff,** )
)
**v.** )      **Case No. 4:15-cv-00395-JAR**
)
**CITY OF ST. LOUIS, MISSOURI,** )
)
)
**Defendant.** )

## MEMORANDUM AND ORDER

This case is before the Court on Movants Brad A. Waldrop, Neighbors of NLEC, Inc.

("NNI"), a Missouri not-for-profit corporation formed in 2012, 1426 Washington Ave. LLC, and

1401 Locust Street, LLC's[1] Supplemental Motion to Intervene[2] (Doc. 32) and Defendant the City

of Saint Louis' ("the City") Motion to Join Required Party (Doc. 37). The motions are fully

briefed and ready for disposition. For the following reasons, the Movants' Motion will be

**GRANTED, in part** and **DENIED, in part,** and Defendant's Motion will be **DENIED.**

## I. Background

Plaintiff New Life Evangelistic Center, Inc. ("New Life") is an interdenominational

Christian church and Missouri non-profit corporation that operates a homeless shelter in its

facility located at 1411 Locust Street in Saint Louis City (hereinafter the "Facility" or "NLEC")

(*Id.* at ¶¶6, 12, 14, 19, 24). According to New Life, the Facility houses on average between 225

---

[1] The Court will refer to Movants 1426 Washington Ave. LLC and 1404 Locust Street, LLC collectively as the "Property Movants."

[2] In their brief, the Movants indicate that they incorporate by reference their previous filings specifically their Motion to Intervene (Doc. 12), their Memorandum in Support of their Motion to Intervene (Doc. 13), their Answer (Doc. 13-1), and their Reply Memorandum in Support of their Motion to Intervene (Doc. 22). The Court will take these previous filings under review with the current Motion.

and 250 individuals per night and, on a cold night, this number may be as high as 300 individuals (*Id.* at ¶22).

On March 16, 1976, the City issued New Life hotel permit No. 84777 (the "Permit"), which allows New Life to provide 32 beds at the Facility (*Id.* at ¶¶17, 18; Doc. 1-7). On April 26, 2013, a petition was submitted to the City's Board of Public Service ("the Board") seeking a hearing before the Board to have the Facility declared a "detriment to the neighborhood" pursuant to Chapter 11.72.010 of the St. Louis City Revised Code (Doc. 1 at ¶55). Pursuant to Chapter 11.72, the Board has the authority to revoke a hotel permit if the hotel in question constitutes a detriment to the neighborhood in which it is located (*Id.* at ¶57; Doc. 1-37). After confirming that the petition contained verified signatures, the Board held several hearings over the course of a six-month period (Doc. 1 at ¶¶61, 62, 63). On December 23, 2014, the Board voted to declare the homeless shelter a detriment to the neighborhood and to revoke New Life's Permit effective May 12, 2015 unless on or before that date New Life provided documentation that it is in compliance with the 32-bed requirement for at least 30 days or New Life provides documentation to the Board demonstrating that it has obtained the necessary permit and/or license to operate its facility (*Id.* at ¶¶67-70). The Board thereafter issued an order memorializing its decision (Doc. 1-37).

On March 3, 2015, New Life filed this action against the City for declaratory relief, injunctive relief, and damages pursuant to the Religious Land Use and Institutionalized Persons Act (RLUIPA), 42 U.S.C. 2000cc et seq., the First and Fourteenth Amendments to the United States Constitution, the Missouri Religious Freedom Restoration Act, Mo. Rev. Stat. Sec. 1.302, and the Missouri Constitution. New Life specifically requests the following relevant relief: that the Court (1) declare the decision by the City to require it to possess a hotel permit in order to run its homeless shelter to be violation of these laws; (2) further declare that New Life is

permitted as of right to use the Facility as a religious organization for all of its intended and stated purposes; (3) permanently enjoin the City from denying New Life the right to use the Facility as an overnight shelter for the homeless; and (4) preliminarily and permanently enjoin the City from enforcing its Revised Code, Building Code, or any other code to prevent New Life from using a portion of the Facility as a homeless shelter (Doc. 1 at 24-25). New Life accordingly filed a Motion for Preliminary Injunction concurrently with its Complaint (Doc. 3) and, on March 16, 2015, New Life moved for a temporary restraining order ("TRO"). In its Motion for TRO, New Life requests that the Court enjoin the City from enforcing the decision of the Board to either revoke its Permit or force it to drastically reduce the number of homeless persons it serves (Doc. 9).

On March 20, 2015, Movants Brad Waldrop, NNI, 1426 Washington Ave. LLC, and 1401 Locust Street, LLC filed a Motion to Intervene (Doc. 12). The Court denied Movants' Motion without prejudice because the Movants lacked standing (Doc. 26). On April 8, 2015, the Court entered an agreed temporary restraining order enjoining the City from revoking New Life's hotel permit until October 15, 2015 or until this Court specifically orders otherwise (Doc. 27). Thereafter, the Court entered a case management order (Doc. 30) and referred this case to alternative dispute resolution (Doc. 31).

On April 24, 2015, the Movants filed a Supplemental Motion to Intervene requesting, pursuant to Federal Rule of Civil Procedure 24(a)(2), that this Court grant them leave to intervene as Defendants in this action, as a matter of right or, alternatively, pursuant to Federal Rule of Civil Procedure 24(b)(2), that this Court grant them leave to intervene as Defendants in this action permissively. In support of their motion, the Movants provide the Affidavit of Brad Waldrop (Doc. 33-2, hereinafter "B.W. Aff.") and the Affidavit of Larry Waldrop (Doc. 33-5,

hereinafter "L.W. Aff.").[3] On May 1, 2015, the City filed a motion to join Brad Waldrop as a required party pursuant to Federal Rule of Civil Procedure 19(a)(1)(B) or, in the alternative, pursuant to Federal Rule of Civil Procedure 21.

## II. Analysis

### A. Supplemental Motion to Intervene

Federal Rule of Civil Procedure 24 governs whether a movant may intervene. FED. R. CIV. P. 24(a), (b). "A court ruling on a motion to intervene must accept as true all material allegations in the motion to intervene and must construe the motion in favor of the prospective intervenor." *Nat'l Parks Conservation Ass'n v. U.S. E.P.A.*, 759 F.3d 969, 973 (8th Cir. 2014). In this Circuit, potential intervenors must establish Article III standing in addition to the requirements of Rule 24. *United States v. Metro. St. Louis Sewer Dist.*, 569 F.3d 829, 834 (8th Cir. 2009). *See also Solliday v. Dir. of Bureau of Prisons,* No. 11-CV-2350 MJD/JJG, 2014 WL 6388568, at *3 (D. Minn. Nov. 14, 2014) ("[A]lthough the Eighth Circuit has not ruled on whether standing is a prerequisite to permissive intervention under Rule 24(b), . . . most courts in this District have required it.") (internal citation omitted). The Circuit further directs the Court to "address questions of standing before addressing the merits of a case where standing is called into question" as is the case here. *Brown v. Medtronic, Inc.,* 628 F.3d 451, 455 (8th Cir. 2010). Therefore, the Court will first address the issue of standing.

### 1. Standing

---

[3] Larry Waldrop's affidavit solely affirms Brad Waldrop's affidavit. Specifically, Larry Waldrop states that Brad Waldrop's statements are consistent with his own experiences as the sole manager of 1401 Locust Street, LLC and 1426 Washington, LLC (L.W. Aff. at ¶3).Accordingly, the Court will only address Brad Waldrop's affidavit, including relevant portions throughout the analysis section.

"Constitutional standing requires a showing of: (1) an injury in fact . . .; (2) causation; and (3) redressability." *Curry v. Regents of Univ. of Minnesota*, 167 F.3d 420, 422 (8th Cir. 1999). An injury-in-fact is "an invasion of a legally protected interest that is concrete, particularized, and either actual or imminent." *Id.* The requirement of imminence insures that the injury is not too speculative and is impending. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 564 n.2 (1992). The Movants must also establish "a causal connection between the injury and the conduct complained of, in other words, the intervenor's alleged injury must be fairly traceable to the [opposing party's] conduct." *Nat'l Parks Conservation Ass'n*, 759 F.3d at 974-75 (internal quotations and citations omitted). Finally, the Movants "must establish that a favorable decision will likely redress the injury." *Id.* (internal quotation omitted). "The burden is on the proposed intervenor to establish standing." *Stenger v. Kellett*, No. 4:11CV2230 TIA, 2012 WL 1392292, at *2 (E.D. Mo. Apr. 23, 2012).

### a. Brad A. Waldrop

Brad Waldrop, president and a member of the Board of Directors of the NNI, resides in St. Louis County (Doc. 33 at ¶¶1, 2). In addition to his role at NNI, Brad Waldrop is the primary asset and property manager for the Movant properties 1426 Washington Ave., LLC and 1401 Locust Street, LLC and works nearly seven days a week in the immediate vicinity of the Facility (*Id.* at ¶¶2, 3). Brad Waldrop has been very involved in the community effort before the Board and was a party to the BPS proceeding (*See Id.* at ¶¶6-8). Brad Waldrop now also asserts that "[New Life's] operations have caused him to suffer injuries that include financial losses, physical harm, profound insecurity due to criminal conduct, and offense to deeply held aesthetic sensibilities" (*Id.*). In support of these assertions, Brad Waldrop provides the Court with his own affidavit.

In his affidavit, Brad Waldrop states "I have suffered a profound, personal negative impact from the presence of NLEC in the community where I work and have invested the last 15 years of my professional life" (B.W. Aff. ¶25). He then provides several examples of physical violence including an incident in 2014 in which he was punched in the face by someone he believed to be from the Facility (*Id.* at ¶26-28). He also alleges that by 2011-12, because of the situation, he became regularly depressed and anxious (*Id.* at ¶30). He further indicates that his own financial situation has been impacted because his compensation is calculated from the gross revenue at the Monkey Building and 1401 Locust (*Id.* at ¶32). Finally, he indicates that he has "spent literally thousands of hours that could have otherwise been spent productively . . . dealing with the impact of NLEC upon the neighborhood" (*Id.* at ¶33).

Despite his extensive involvement in the BPS proceeding, the Court finds that Brad Waldrop does not sufficiently allege any economic or other legally protected interest that would be harmed by an unfavorable outcome in this litigation. The Supreme Court has put it succinctly:

> The presence of a disagreement, however sharp and acrimonious it may be, is insufficient by itself to meet Art. III's requirements. This Court consistently has required, in addition, that the party seeking judicial resolution of a dispute show that he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the other party. The exercise of judicial power can so profoundly affect the lives, liberty, and property of those to whom it extends, that the decision to seek review must be placed "in the hands of those who have a direct stake in the outcome. It is not to be placed in the hands of "concerned bystanders," who will use it simply as a vehicle for the vindication of value interests.

*Diamond v. Charles*, 476 U.S. 54, 62 (1986) (internal citations omitted). Brad Waldrop does not live in the area or own neighboring property. Any economic interest resulting from his alleged reduced compensation is too remote to justify his involvement in this action. Furthermore, while in the context of an environmental case, harm to aesthetic, environment, or recreational interests is sufficient to constitute an injury-in-fact, the Parties have not presented the Court with an issue of environmental law. *See Sierra Club v. Morton*, 405 U.S. 727 (1972). Again, the Court can

appreciate the significant role Brad Waldrop played in the underlying action before the Board and that he may have been a party to this litigation if New Life had chosen to appeal the Board's decision to the state court, however this role and his alleged injuries are not sufficient to establish Article III standing.

### b. Neighbors of NLEC, Inc. (NNI)

NNI is a not-for-profit corporation formed on May 22, 2012 with the stated purpose to "provide strategic guidance and financial assistance to a neighborhood movement which is exercising its right to petition a business in the area which is generally considered to be a detriment to the neighborhood" (Doc. 33 at ¶2). Movants assert that the referenced "business" is New Life and the "neighborhood" is Saint Louis City (*Id.*). NNI "actively worked" to have BPS determine that the Facility is a detriment to the neighborhood (*Id.*). Movants further argue that NNI "was formed for the specific social welfare purpose of dealing with the harms inflicted by NLEC on its neighbors" (*Id.* at 7).

The Court previously denied the intervention of NNI because the Movants failed to identify its membership, if any, how this membership's interest relates to NNI's purpose, or how NNI's interest is impacted by this litigation. Movants now clarify that NNI is asserting a direct injury to itself as the principal basis for its standing and is a not-for-profit corporation without members (Doc. 33 at 7 & n.10). Specifically, Movants assert:

> Certainly, given that its overarching lawful purpose is to attempt to address and reduce the injuries that NLEC causes, and this lawsuit threatens to result in a judgment that would perpetuate (and very possibly exacerbate) the negative consequences of NLEC's operations, NNI has a legally protectable interest that is concrete, imminent, that is at serious risk by virtue of the possible outcome of this lawsuit, and that would be promoted (and possibly ultimately vindicated) by a judgment adverse to NLEC herein).

NNI itself has not suffered an injury because a decision in this matter does not "curtail" its ability to continue its purpose of providing "strategic guidance and financial assistance to a

neighborhood movement which is exercising its right to petition a business in the area which is generally considered to be a detriment to the neighborhood" (Doc. 33 at ¶2). *Plotkin v. Ryan*, 239 F.3d 882, 886 (7th Cir. 2001) ("The BGA in the past has been instrumental in advancing government reforms in Illinois by using investigators and attorneys along with journalistic techniques and litigation to expose corruption. This decision does not curtail those regular techniques of the BGA.") Further, "[A] mere 'interest in a problem,' no matter how longstanding the interest and no matter how qualified the organization is in evaluating the problem, is not sufficient by itself to render the organization 'adversely affected' or 'aggrieved' . . . ." *Sierra Club*, 405 U.S. at 739. "[I]f a 'special interest' in this subject were enough to entitle [the Movant] to commence this litigation, there would appear to be no objective basis upon which to disallow a suit by any other bona fide 'special interest' organization however small or short-lived." *Id.* Therefore, NNI's interest in the Facility and the surrounding neighborhood is not sufficient to establish standing.

Movants also assert that the Court should consider the harm to the organization's officers as sufficient to establish associational standing (Doc. 33 at 7 n.10), a theory they expand upon in their reply (Doc. 40 at 5). Movants appear to assert that although the association does not have any members, the Court should treat NNI's officers as if they were members and afford the association standing on the basis of these officers' alleged injuries. As a preliminary matter, the Court need not address this argument because it is first truly raised in the Movants' reply. Nevertheless, even if the Court were to assume that the officers, Brad Waldrop and Larry Waldrop, were to be treated as members of this organization, the Court has already determined that Brad Waldrop does not have standing and the Movants fail to address what, if any, injury Larry Waldrop has suffered.

Therefore, NNI has failed to sufficiently establish that is has Article III standing.

### c. The Property Movants

The Property Movants are the owners of two buildings neighboring the New Life Facility. 1426 Washington Ave., LLC is a limited liability company that owns the commercial realty at 1426 Washington Ave., St. Louis, Missouri commonly referred to as the "Monkey Building." The Monkey Building is located immediately north of the New Life Facility and shares an alley with it (Doc. 33 at ¶3). 1401 Locust Street, LLC is a limited liability company that owns a commercial parking lot that is immediately east of the New Life Facility. The parking lot and the New Life Facility share a property line (*Id.* at ¶4). The Property Movants assert that they have "dramatically suffered financially" as a result of the operations at the Facility (*Id.* at ¶5). Specifically, the Property Movants assert that they have suffered "enormous damage to property values and significant annual loss of profits attributable to the activities of [New Life]" (*Id.*). They further indicate that they have "incurred out-of-pocket capital investments that were attributable to the Property Movants' needs to mitigate the devastating impacts of [New Life's] operations upon their properties so that their cash flow and value losses were not greater" (*Id.*).

In support of these assertions, the Movants provide the affidavit of Brad Waldrop. Brad Waldrop has been the property manager and owner's asset manager for the Monkey Building and 1401 Locust Street for more than seven (7) years (B.W. Aff. ¶¶1, 15). He also has worked part time as a real estate developer since 2003 and as a licensed real estate broker since about 2011 (*Id.* at ¶¶2, 3). He asserts, "I am intimately familiar with the market for the rental and sale of office, retail and parking properties along Washington Avenue" (*Id.* at ¶3).

Brad Waldrop indicates that the New Life Facility is the primary and dominant obstacle to the profitable operation of the Monkey Building (*Id.* at ¶4). The Monkey Building has 18,030 rentable square feet of office space on the 2nd and 3rd floors of the property and 9,015 net

rentable square feet of retail space on the ground floor of the property (*Id.* at ¶6). Brad Waldrop asserts that the Monkey Building has averaged an occupancy rate of approximately 80% for both its office and retail spaces (*Id.* at ¶7). He argues that this rate is "well below average for such a property" (*Id.*). In support of this claim, Brad Waldrop asserts that properties with comparable locations "tend to lease up to full occupancy (essentially 95%, which accounts for tenants transitioning into and out of the space)" (*Id.*). He further argues that "100% of this 15% deficit in occupancy can be attributed to the operations of NLEC and the fact that many tenants either simply do not want to lease at the Monkey Building or want to leave after they have become tenants there, because of how NLEC impacts their experience there" (*Id.*).

Brad Waldrop also asserts that the average office rental rate at the Monkey Building is $3/sf[4] less than comparable buildings in the area. He argues that this deficit is "entirely attributable to the operation of NLEC immediately across St. Charles Street" (*Id.* at ¶ 8). He additionally asserts that the Monkey Building can only achieve an average rental rate of $12/sf triple net[5] for its retail space whereas comparable building are about to obtain $16/sf triple net (*Id.* at ¶9). Furthermore, Brad Waldrop argues, "Because of the presence of NLEC next door, the Monkey Building experiences increased operating expenses related to security, management, and maintenance expenses in dealing with the criminal activity surrounding NLEC and protecting the tenants of the Monkey Building and their customers from this activity"[6] (*Id.* at ¶10). Brad Waldrop therefore concludes that he "conservatively" estimates that the Monkey Building loses

---

[4] The Court uses the abbreviations provided by the Movants. Accordingly "sf" stands for square foot in this context.
[5] Brad Waldrop clarifies that "[t]he term 'triple net' as used herein means that the tenant pays its utility expenses, as well as its pro rated share of the buildings [sic] real estate taxes and property insurance" (*Id.* at ¶9).
[6] Brad Waldrop thereafter specifies that the Monkey Building was "forced" to lease a unique 5-camera security camera system at an expense of $3000/year and to expend maintenance and janitorial expenses in excess of $3,000/year (*Id.* at ¶10). He also includes the "dozens of hours per year" that he spends "dealing with all aspects of the massive detriment NLEC causes" (*Id.*).

approximately $125,810 in annual cash which at a 10% capitalization rate results in a $1,258,100 decrease in property value (*Id.* at ¶¶11-13).

Brad Waldrop also provides two anecdotes he argues show "the impact NLEC has upon the leasing of the Monkey Building" (*Id.* at ¶14). First, he indicates that the Monkey Building had a tenant, HCFS, Inc., who declined to renew a 3 year lease (*Id.*). According to Brad Waldrop, "the local manager of HCFS, Inc. told me that she was not renewing because of building security concerns related to NLEC's operations" (*Id.*). Second, Brad Waldrop states that after a tenant left the building, the space remained vacant for over a year (*Id.*). He asserts that, "in my professional opinion," he was unable to sublease the space because "once they fully understood the impact of NLEC upon the neighborhood surrounding the Monkey building," the potential tenants declined to lease the space (*Id.*).

Regarding the parking lot located at 1401 Locust Street, Brad Waldrop states that prior to the installation of a fence, New Life's clients would "constantly trespass onto the property . . . by walking across the property in order to go to the alley located behind NLEC, for general gathering, or for littering, panhandling, fighting, car clouting, drinking alcohol, using drugs, drug dealing, urinating and defecating, or otherwise" (*Id.* at ¶16). Brad Waldrop alleges that as a result of this behavior, 1401 Locust was "forced" to install the fence at a cost of approximately $25,000 as well as $7,500 worth of new lighting (*Id.* at ¶17).

Brad Waldrop further alleges that "the presence of NLEC immediately adjacent to 1401 Locust dramatically suppressed property case flow and value" (*Id.* at ¶18). He claims extensive experience because he has helped investors in the area develop no less than five parking lots in the area and because he is the property and asset manager for two other parking lots immediately to the north of 1401 Locust (*Id.*). He asserts that if NLEC was no longer in operation at 1411 Locust, daily parking revenues, monthly parking revenues, and special event parking revenues

would double (*Id.* at ¶¶19-21). He estimates that the elimination of the Facility would increase revenues at 1401 Locust by at least $55,850 annually (*Id.* at ¶22). Brad Waldrop also asserts that the operation of the Facility increases 1401 Locust's operating expenses by $1,500 per year in fence repairs and $200 per month in maintenance and clean up (*Id.* at ¶23). He therefore calculates a decreased property value of "just under $600,000" (*Id.* at ¶24).

Allegations of economic harm may establish Article III standing. *Nat'l Parks Conservation Ass'n,* 759 F.3d at 975 (finding a risk of direct financial harm establishes injury in fact required for Article III standing). However, general economic interests are not protectable nor are interests that are too remote from the subject matter of the proceeding. *Metro. St. Louis Sewer Dist.,* 569 F.3d at 836; *Standard Heating & Air Conditioning Co. v. City of Minneapolis*, 137 F.3d 567, 571 (8th Cir. 1998). Previously, the Court found that the Property Movants failed to specifically state how they have suffered economically or how their economic loss relates to the present action.

In their supplemental motion, the Property Movants support their allegations of an economic injury with the affidavits of both Brad Waldrop and Larry Waldrop. Brad Waldrop has provided sufficient support of specific economic harm, that of decreased property values and an increase in operating cost. Also, while Brad Waldrop's allegations occasionally conflate the current method of operation of the Facility with *any* operation of the Facility, construing the motion in favor of the Property Movants, the Court finds there to be a sufficient causal link between the way the Facility is currently operated and these specific harms. The Court further finds that the specific economic injury can be redressed with a favorable outcome in this litigation. Even accounting for the possibility of a different kind of permit which would perhaps allow more individuals to stay at the Facility, an option contemplated by the Board in its

decision, a favorable outcome in the litigation would result in a change in the way the Facility is currently operated thus redressing the Property Movants' injury.

Accordingly, the Court finds that the Property Movants have sufficiently established Article III standing at this stage of the litigation. *Lujan*, 504 U.S. at 561.

**2. Intervention**

As the Court has established that the Property Movants have sufficiently alleged Article III standing, the undersigned must now determine whether the Property Movants can intervene pursuant to Federal Rule of Civil Procedure 24(a)(2), or, alternatively, pursuant to Federal Rule of Civil Procedure 24(b)(2).

**a. Intervention as a Matter of Right**

Pursuant to Federal Rule of Civil Procedure 24(a):

> On timely motion, the court must permit anyone to intervene who . . . claims an interest relating to the property or transaction that is the subject of the action and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest.

To intervene as a matter of right, a proposed intervener must meet the following three conditions: "(1) it has a recognized interest in the subject matter of the litigation; (2) the interest might be impaired by the disposition of the case; and (3) the interest will not be adequately protected by the existing parties." *S. Dakota ex rel Barnett v. U.S. Dep't of Interior*, 317 F.3d 783, 785 (8th Cir. 2003).

For the purposes of Rule 24(a)(2), an asserted interest must be "significantly protectable." *Planned Parenthood of Minn., Inc. v. Citizens for Cmty. Action*, 558 F.2d 861, 869 (8th Cir.1977) (quoting *Donaldson v. United States*, 400 U.S. 517, 531 (1971)). The quoted term has been interpreted to mean "legally protectable." *Metro. St. Louis Sewer Dist.*, 569 F.3d at 839. "Interests in property are the most elementary type of right that Rule 24(a) is designed to

protect." *Planned Parenthood of Minnesota, Inc.*, 558 F.2d at 869 (internal citation omitted). In this case, the result of the litigation "necessarily bears directly on the neighbors' property interests" considering the factors used by the Board in determining that the operation of the New Life Facility was detrimental to the neighborhood. *Id.* Further*,* if the City remains enjoined from enforcing the Board's decision, New Life will be able to continue the operation of its Facility in the manner at issue in the Board's order. Therefore, the Court concludes that the Property Movants' have a legally protectable interest in the subject matter of the litigation and that their ability to protect their interest may be impaired or impeded by the disposition of this case.

"Finally, in order to intervene under Rule 24(a)(2), the applicants must carry the 'minimal burden of showing that their interests are not adequately protected by existing parties." *Id.* Although the burden to show inadequate representation is generally "minimal," this court has recognized that the applicant for intervention bears a heavier burden on this factor when a party already in the suit has an obligation to represent the interests of the party seeking to intervene. *United States v. Union Elec. Co.*, 64 F.3d 1152, 1168 (8th Cir. 1995). The Movants generally assert that "It is uncertain whether the City will adequately protect the Movants' interests" (Doc. 33 at 9). While the City has an interest in upholding the Board's decision, its interest is "disparate" from that of the Property Movants. *Planned Parenthood of Minnesota, Inc.*, 558 F.2d at 870. Specifically, the Property Movants "are concerned only with their own property values," whereas the City is concerned with the general public interest. *Id. See also Little Rock Sch. Dist. v. N. Little Rock Sch. Dist.*, 378 F.3d 774, 780 (8th Cir. 2004) ("The party may meet that burden by showing that its interests at risk in the litigation are not shared by the general citizenry.") Therefore, the Court finds that the Property Movants have met their burden to show that their interests are not adequately protected by the existing parties.

Accordingly, the Court finds that it must permit the Property Movants to intervene.

### b. Permissive Intervention

Because the Court has determined that the Property Movants must be permitted to intervene pursuant to Rule 24(a)(2), the Court need not address permissive intervention under Rule 24(b). Nevertheless, in the interest of a full and fair review, the Court will do so.

Pursuant to Federal Rule of Civil Procedure 24(b)(1)(B), "On a timely motion, the Court may permit anyone to intervene who . . . has a claim or defense that shares with the main action a common question of law or fact." "The decision to grant or deny a motion for permissive intervention is wholly discretionary." *S. Dakota ex rel Barnett*, 317 F.3d at 787. "The principal consideration in ruling on a Rule 24(b) motion is whether the proposed intervention would unduly delay or prejudice the adjudication of the parties' rights." *Id.* The Court finds that the Property Movants should be permitted to intervene because, given the early stage of this litigation, their intervention would not unduly delay or prejudice the adjudication of the parties' rights. Therefore, the Court finds, in the alternative, that the Property Movants have a permissive right to intervene.

Accordingly, the Court finds that the Property Movants shall be permitted to intervene and Brad Waldrop and NNI shall not be permitted to intervene. Furthermore, the Court finds that Brad Waldrop's and NNI's interests are adequately protected by the Property Movants as more thoroughly discussed herein.

### B. Motion to Join Required Party

On May 1, 2015, the City filed a motion to join Brad Waldrop as a required party pursuant to Federal Rule of Civil Procedure 19(a)(1)(B) or, in the alternative, pursuant to Federal Rule of Civil Procedure 21.

### 1. Required Joinder

The City asserts that Waldrop is a required party to this action pursuant to Rule 19(a)(1)(B). Specifically, the City argues that proceeding with this action in Brad Waldrop's absence will impair or impede his ability to protect his interest in maintaining the favorable outcome he achieved in the BPS administrative proceedings. Further, the City asserts that its interest in this litigation is not duplicative of Brad Waldrop's interest because, at the administrative stage, BPS acted in a neutral fact-finding and adjudicative capacity and neither the City nor BPS was a party to the proceeding. The City also asserts that Brad Waldrop will be affected by this litigation because "[i]f NLEC enjoys any degree of success in the instant litigation, NLEC will be permitted to continue its operations and possibly exceed the 32-bed occupancy limit set by the BPS Order" (Doc. 37-1 at 7). Finally, the City argues that Brad Waldrop should be joined pursuant to FRCP 19 because he will be without recourse should New Life prevail in this action. Specifically, the City asserts that following the Board's order, New Life had a right to judicial review of the decision in state court and Brad Waldrop would have been a party to such an action. Instead, argues the City, New Life "is circumventing the typical recourse for a party aggrieved by an administrative order" by filing this federal suit against the City.

New Life responds that Brad Waldrop is not a required party pursuant to Rule 19. Specifically, New Life argues that Brad Waldrop's joinder would deprive the Court of subject-matter jurisdiction because Brad Waldrop does not have standing and standing is an essential element of subject-matter jurisdiction. Next, New Life argues that the Court can accord complete relief without Brad Waldrop joining as a party defendant because the four claims raised by New Life can only be brought against a governmental defendant and therefore there is no basis through which Brad Waldrop can participate in this litigation as a party defendant. New Life also asserts that Brad Waldrop does not claim an interest relating to the subject of the action because

his lack of a legally recognized interest in any property within the immediate vicinity of the Facility suffices to show that he lacks a legally recognized interest relating to the subject matter at issue in this litigation. Further, New Life argues that Brad Waldrop cannot show that the City cannot adequately represent his purported interest in his absence. Finally, New Life asserts that it acted properly by initiating the instant federal litigation rather than appealing in state court because, as a property owner, it had received a final decision from the governmental entity and therefore its religious land use claim is ripe.

In its reply, the City asserts that Brad Waldrop has standing because, as a neighborhood property manager and real estate developer Brad Waldrop possesses an injury in fact, this injury is fairly traceable to New Life, and that upholding the Board's decision will remedy Brad Waldrop's injuries. The City also argues that Brad Waldrop should be joined because he is procedurally capable of intervening in Plaintiff's RLUIPA and § 1983 claims. Finally, the City reiterates its assertion that Brad Waldrop should be joined because litigating this case without Brad Waldrop will impede his ability to protect his interest in upholding the Board's Order.

Under Rule 19, "A court must first determine whether a [person] should be joined if 'feasible' under Rule 19(a), i.e., whether a person is 'necessary'. If the person is not necessary, then the case must go forward without him and there is no need to make a Rule 19(b) inquiry." *Gwartz v. Jefferson Memorial Hospital*, 23 F.3d at 1428 (8th Cir. 1994). (internal citations and quotations omitted). The City argues that Brad Waldrop is a required party under Rule 19(a)(1)(B)(i). The relevant portion of Rule 19 provides:

> (a) (1) A person who is subject to service of process and whose joinder will not deprive the court of subject-matter jurisdiction must be joined as a party if:
> > (B) that person claims an interest relating to the subject of the action and is so situated that disposing of the action in the person's absence may:
> > (i) as a practical matter impair or impede the person's ability to protect the interest.

"Subpart[] (i) . . . [is] contingent, however, upon an initial requirement that the absent party claim a legally protected interest relating to the subject matter of the action." *Northrop Corp. v. McDonnell Douglas Corp.*, 705 F.2d 1030, 1043 (9th Cir. 1983). "This interest must be legally protected and not merely a financial interest or an interest of convenience." Coquillette, et al., MOORE'S FEDERAL PRACTICE §1903[3][b] (3d ed. 2011) (citing *Northrop Corp*, 705 F.2d at 1043). *See also ACI Worldwide Corp. v. MasterCard Technologies, LLC*, No. 8:14CV31, 2014 WL 7409750, at *4 n.1 (D. Neb. Dec. 31, 2014) (collecting cases).

The City asserts that Brad Waldrop's interest is "in maintaining the favorable outcome he achieved in the BPS administrative proceeding" (Doc. 37 at 3). While Brad Waldrop clearly has an interest in the litigation under the plain meaning of the word, the City has failed to establish he has a legally protected interest in the subject of the litigation. New Life is not seeking any relief from Brad Waldrop nor would Brad Waldrop be bound by any decision made by the Court. Even if Brad Waldrop could claim an interest in the subject of the litigation, he cannot show that his absence as a practical matter would impair or impede his interest. The Court has found that the Property Movants can intervene as a matter of right. Accordingly, the Property Movants will be able to advance arguments in support of their interests. Brad Waldrop is the property manager of the Property Movants and his father, Larry Waldrop, has the managing interest in the Property Movants. Considering the significant relationship between Brad Waldrop, Larry Waldrop, and the Property Movants, the Court finds that the Property Movants will adequately represent Brad Waldrop's interest because the Property Movants have "the same interest in establishing the facts that [Brad Waldrop] does." *Gwartz*, 23 F.3d at 1429. Therefore, Brad Waldrop's absence as a practical matter does not impair or impede his ability to protect his alleged interest.

Finally, without commenting on the validity of New Life's litigation strategy, the Court does not find convincing the City's argument that as a result of this litigation strategy, Brad

Waldrop should be joined because he would be without recourse if New Life prevails in this action . Although Brad Waldrop may have been a party to the litigation if New Life had decided to appeal the Board's decision in state court, the Board's decision is final, this case is before the Court on different claims, and any potential injury to Brad Waldrop is too remote to warrant his joinder to this action as a required party defendant.

### 2. Misjoinder or Nonjoinder of Parties

In the alternative, the City argues that justice requires the addition of Brad Waldrop as a party defendant pursuant to Rule 21. New Life responds that Brad Waldrop should not be joined under Rule 21 because a federal lawsuit "is not a forum for the airing of interested onlookers' concerns" (Doc. 41 at 10 (citing *Mausolf*, 85 F.3d 1295, 1301 (8th Cir. 1996) (internal quotation omitted))).

Federal Rule of Civil Procedure 21 "Misjoinder and Nonjoinder of Parties" provides, "On motion or on its own, the court may at any time, on just terms, add or drop a party." As the title of the Rule indicates, the primary function of Rule 21 is to cure the misjoinder or nonjoinder of parties. Misjoinder is not at issue in this case and, as the Court has determined that Brad Waldrop is not a necessary party, nonjoinder also does not apply. However, even in the absence of misjoinder or nonjoinder, a court may issue an order pursuant to Rule 21 to structure a case for the efficient administration of justice. *Stark v. Indep. Sch. Dist. No. 640*, 163 F.R.D. 557, 564 (D. Minn. 1995) (There is "an unarticulated premise that the underlying purpose of Rules 19, 20 and 21 is to allow the district court itself to exercise its power to align the parties and the issues presented in a single lawsuit in a way that will foster judicial efficiency, while protecting parties against prejudice.") District courts have discretion to determine whether joinder is appropriate, and their analysis is performed on a case by case basis. *See Mosley v. General Motors Corp.*, 497 F.2d 1330, 1332-1333 (8th Cir.1974). *See also Bibbs v. Early,* 541 F.3d 267, 274 (5th Cir. 2008)

([A] "district court has broad discretion in determining the propriety of joining a particular party as a defendant") (internal quotation omitted).

The Court does not find justice requires the joinder of Brad Waldrop as a party defendant in this case. While the City cites to *Graziosi* and *Hogan* in support of its position that justice requires the joinder of Brad Waldrop, those cases can be easily distinguished from facts before the Court. Unlike in *Graziosi*, the Court has already determined that Brad Waldrop is not a required party. *Graziosi v. MetLife Investors USA Ins. Co.*, No. 3:11-CV-80 CAR, 2011 WL 4970687, at *3 (M.D. Ga. Oct. 19, 2011) (finding first that the individuals to be joined were required parties). Additionally, Brad Waldrop's involvement does not meet the exceptional circumstances of *Hogan. Cornelius v. Hogan*, 663 F.2d 330, 335 (1st Cir. 1981) (upholding the district court's decision to bind a governmental agency to a consent decree because the responsibility for performing certain programs covered by the decree had been transferred from one of the defendants to the governmental agency). A district court "is well-placed to determine what ruling will best promote justice." *Id.* Considering the specific circumstances of this case and the intervention of the Property Movants, the Court finds that justice does not require the joinder of Brad Waldrop as a party defendant.

Therefore, the City's Motion to Join Required Party (Doc. 37) is **DENIED.**

### III. Conclusion

Accordingly,

**IT IS HEREBY ORDERED** that Movants Brad A. Waldrop, Neighbors of NLEC, Inc., 1426 Washington Ave. LLC, and 1401 Locust Street, LLC's Motion to Intervene (Doc. 12) is **GRANTED, in part** and **DENIED, in part.** 1426 Washington Ave LLC and 1401 Locust Street, LLC shall be permitted to intervene in this action.

**IT IS FURTHER ORDERED** that 1426 Washington Ave LLC and 1401 Locust Street, LLC's answer is due on or before **May 20, 2015.**

**IT IS FURTHER ORDERED** that the City's Motion to Join Required Party (Doc. 37) is **DENIED.**

**IT IS FURTHER ORDERED** that 1426 Washington Ave LLC and 1401 Locust Street, LLC shall have until **May 26, 2015** to file their responses, if they so choose, to any currently pending motions before the Court. Any reply to these Parties' responses shall be due on or before **May 29, 2015.**

Dated this 19th day of May, 2015.

_____
**JOHN A. ROSS**
**UNITED STATES DISTRICT JUDGE**